

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

TJT/JPL:AB
F. #2018R01917

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

January 6, 2025

By ECF

The Honorable Brian M. Cogan
United States District Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

      Re:   United States v. Michael Vax,
              Criminal Docket No. 22-324 (BMC)

Dear Judge Cogan:

      The government respectfully submits this letter in anticipation of sentencing in the above-captioned case, which is scheduled for Monday, January 13, 2025, at 3:30 p.m. On September 23, 2022, the defendant pleaded guilty to a one-count Information that charged him with conspiracy to offer and pay healthcare kickbacks, in violation of 18 U.S.C. § 371. The defendant committed a serious offense, paying over $5 million in kickbacks to obtain doctor's orders for orthotic braces and related durable medical equipment ("DME") that his companies would then bill to federal healthcare programs. And he engaged in this misconduct over the course of a nearly three-year period in which he was already on pretrial release for securities fraud, money laundering, and extortion conspiracy charges in the Southern District of New York.

      Given the circumstances of the offense and the need for deterrence, the government respectfully submits that the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") advisory term of 60 months' imprisonment is sufficient and not greater than necessary to achieve the goals of sentencing. See 18 U.S.C. § 3553(a). The government also respectfully submits that the Court should order the defendant to pay restitution in the amount of $5,067,936 to the Centers for Medicare & Medicaid Services ("CMS"), and a forfeiture money judgment in the amount of $5,067,936.

I.  Background

   A.  The Offense Conduct

   Together with others, the defendant owned and operated several DME companies including National Brace Inc. (the "NBI Companies"). (June 27, 2024 Presentence Investigation Report ("PSR") ¶ 13). The NBI Companies included entities that were authorized to bill federal healthcare benefit programs such as Medicare for DME provided to beneficiaries. (Id. ¶ 13). However, Medicare would only reimburse claims for DME that were reasonable, medically necessary, and ordered by a physician. (Id. ¶ 9). Medicare would not pay for DME claims that were made possible through the payment of kickbacks and bribes, either. (Id.).

   Between August 2016 and April 2019, the defendant nonetheless paid kickbacks to so-called "Marketing Companies" that then provided him with signed physicians' orders for the NBI Companies' DME. (Id. ¶¶ 15–17). The Marketing Companies obtained these doctors' orders by paying kickbacks to purported telemedicine companies, rather than through any legitimate marketing services. (Id. ¶ 16–17). By paying kickbacks to secure these doctors' orders, the defendant enabled the NBI Companies to bill Medicare roughly $29 million and receive $14 million in reimbursement for DME. (Id. ¶¶ 16–19; Information, ECF No. 5, ¶ 16).

   B.  Procedural History

   On September 23, 2022, the defendant pleaded guilty to a one-count Information that charged him with conspiracy to offer and pay healthcare kickbacks, in violation of 18 U.S.C. § 371. (PSR ¶ 1). The defendant allocuted that he was the organizer and operator of the NBI Companies, and that he violated the law by entering into kickback arrangements to obtain DME business for the NBI Companies. (Sept. 23, 2022 Tr. at 35:5-20, 36:2-5). The defendant further admitted that he knowingly and intentionally violated the law by entering this kickback agreement, and he recognized that federal healthcare programs including Medicare and Medicaid would make payments in connection with the NBI Companies' DME claims. (Id. at 35:18-36:1).

   Pursuant to the plea agreement, the defendant agreed to pay restitution in the amount of $5,067,936. (PSR ¶ 96). The defendant also acknowledged in the plea agreement that he obtained and acquired property that is subject to forfeiture, and he consented to the entry of a forfeiture money judgment in the amount of $5,067,936. (Id. ¶ 94).

II.  The Defendant's Guidelines Term

   The government agrees with the United States Probation Department's calculation of the Defendant's Guidelines sentencing range. The PSR calculated a total offense level of 26 for the defendant, based upon the following estimate (PSR ¶¶ 26–35):

   | | |
   |---|---|
   | Base Offense Level: 8 (§ 2X1.1(a), 2B4.1(a)) | 8 |
   | Plus: Losses over $3,500,000 (§ 2B1.1(b)(1)(J)) | +18 |
   | Plus: Commission of Offense on Release (§ 3C1.3) | +3 |
   | Subtotal: | 29 |
   | Minus: Acceptance of responsibility (§ 3E1.1) | -3 |
   | Total: | 26 |

The PSR estimated that the defendant falls into Criminal History Category I, resulting in an advisory sentencing range of 63 to 78 months' imprisonment. (Id. ¶¶ 42, 85). However, because the statutorily authorized maximum term of imprisonment for a violation of 18 U.S.C. § 371 is five years, the defendant's restricted Guidelines term of imprisonment is 60 months. (Id. ¶¶ 84, 85).

III.     A Guidelines Sentence of Incarceration Is Appropriate

   A.    Legal Standard

While the Guidelines are advisory rather than mandatory, district courts are still "require[d] . . . to consider Guidelines ranges" in determining sentences. United States v. Booker, 543 U.S. 220, 245 (2005); see 18 U.S.C. § 3553(a). The Supreme Court has elucidated the proper procedure for sentencing courts to follow in light of Booker: "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." Gall v. United States, 552 U.S. 38, 49 (2007) (citation omitted). Next, a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, [the Court] may not presume that the Guidelines range is reasonable. [The Court] must make an individualized assessment based on the facts presented." Id. at 50 (citation and footnote omitted).

The Section 3553(a) factors that the Court must consider in sentencing the defendant include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to (a) reflect the seriousness of the offense, to promote respect for the law and to provide just punishment, (b) afford adequate deterrence to criminal conduct, (c) protect the public from further crimes of the defendant, and (d) provide the defendant with appropriate education or vocational training; (3) the kinds of sentences available; (4) the Guidelines range; (5) pertinent policy statements of the Sentencing Commission; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution.

   B.    Application of Law

The government respectfully requests that the Court impose a 60-month Guidelines term of imprisonment. A Guidelines sentence is sufficient but not greater than necessary to achieve the goals of sentencing, and it would appropriately reflect important factors including the seriousness of the offense and the need for deterrence. See 18 U.S.C. § 3553(a).

   1.    The Seriousness, Nature, and Circumstances of the Offense

For nearly three years, the defendant knowingly and intentionally paid kickbacks to secure doctors' orders that enabled his NBI Companies to receive $14 million that Medicare otherwise would not have paid. That is a serious offense.

The offer and payment of healthcare kickbacks, and the fraud against federal healthcare benefit programs that those kickbacks enable, target national programs relied on by

3

millions of Americans. Congress aptly summarized the effects of health care fraud and related offenses over forty-five years ago:

> In whatever form it is found, . . . fraud in these health care financing programs adversely affects all Americans. It cheats taxpayers who must ultimately bear the financial burden of misuse of funds in any government-sponsored program. It diverts from those most in need, the nation's elderly and poor, scarce program dollars that were intended to provide vitally needed quality health services.

H.R. 95-393, pt. II, at 44 (1977); see also H.R. Rep. 104-747 (1996) ("Everyone pays the price for health care fraud: beneficiaries of Government health care insurance such as Medicare and Medicaid pay more for medical services and equipment; consumers of private health insurance pay higher premiums; and taxpayers pay more to cover health care expenditures."). These concerns are just as pressing today, which is why Congress has enacted increasingly severe penalties for health care fraud, most recently directing the Sentencing Commission to add enhancements for defendants who commit the most financially serious health care frauds. See Patient Protection and Affordable Care Act, Pub. L. No. 111-148, §10606(a)(2)(C), 124 Stat. 119, 1007 (2010) (directing Sentencing Commission to amend guidelines in order to punish health care fraud more severely).

The nature and circumstances of the offense reinforce the need for a Guidelines sentence. The defendant committed this offense while on pretrial release for a series of pump-and-dump schemes that resulted in over $3.5 million in losses to investors. (PSR ¶ 40). The defendant effectively took advantage of his nearly six-year term of pretrial release to engage in an even more lucrative deception that simply victimized federal programs rather than investors. ███████████████████████████████████████████████████████████████████████████████████████ Under the circumstances, a Guidelines sentence is needed to promote respect for the law.

    2.    <u>Affording General and Specific Deterrence</u>

A Guidelines sentence is also necessary to deter others from engaging in similar behavior. See 18 U.S.C. § 3553(a)(2)(B), (C). Kickback schemes like the one charged in this case threaten the integrity of federal healthcare programs. Because the profits arising from these schemes are often enormous — the only limiting variables are the criminals' ability to manufacture claims and their likelihood of getting caught — it is critical to address the problem through systematic deterrence.

Moreover, because "economic and fraud-based crimes are more rational, cool and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." See, e.g., United States v. Martin, 455 F.3d 1227, 1240 (11th Cir. 2006) (internal quotation marks and citation omitted). As courts in this District have recognized, "[t]he need for general deterrence is particularly acute in the context of white-collar crime." United

4

States v. Johnson, No. 16-CR-457-1 (NGG), 2018 WL 1997975, at *5 (E.D.N.Y. Apr. 27, 2018); see also; United States v. Mueffelman, 470 F.3d 33, 40 (1st Cir. 2006) (deterrence of white-collar crime is "of central concern to Congress"). This is true, in part, because "[p]ersons who commit white-collar crimes like defendant's are capable of calculating the costs and benefits of their illegal activities relative to the severity of the punishments that may be imposed." See Johnson, 2018 WL 1997975 at *5 (internal quotation marks omitted); see also Harmelin v. Michigan, 501 U.S. 957, 988 (1991) ("[S]ince deterrent effect depends not only upon the amount of the penalty but upon its certainty, crimes that are less grave but significantly more difficult to detect may warrant substantially higher penalties"). This is especially true when the potential rewards for would-be criminals who are not caught can be substantial.

This case also presents the need for specific deterrence. As noted above, this is not the defendant's first time engaging in white-collar federal offenses. At the time he committed the instant offense, he had been charged in the Southern District of New York with a range of other crimes including conspiracy to commit securities fraud, conspiracy to commit extortion, and conspiracy to commit money laundering. (PSR ¶ 40). ███████████████████████████████████████████████ That scheme was not the defendant's first, either. In 1995, the United States District Court for the Northern District of Georgia sentenced him to 41 months of imprisonment for his role in a racketeering conspiracy involving the fraudulent use of shell companies to avoid paying over $1 million in excise taxes to the IRS. (Id. ¶ 39). And putting aside these convictions, the PSR reflects that the defendant has been arrested no less than four other times for offenses dating back to 1984. (Id. ¶¶ 45–48). The defendant has repeatedly committed serious criminal offenses over a span of roughly three decades, and it is clear that a sentence of incarceration is needed to deter him from further criminal conduct.

3.  A Downward Variance Is Not Warranted Here

The government respectfully submits that a downward variance is not appropriate. As an initial matter, the Guidelines term here is already less than the defendant's offense conduct would typically warrant. But for the statutory maximum limit, the defendant's offense conduct would have resulted in a Guidelines sentencing range of 63-78 months' imprisonment. (PSR ¶¶ 84, 85). Even that Guidelines range is predicated on the defendant's Criminal History Category of I, which derives from the sentence of time served that he received in the securities fraud case. There is strong reason to believe that the defendant would have received a less lenient sentence if his participation in the instant offense had been known to the sentencing court, and his Criminal History Category and Guidelines range would therefore likely have been higher in this case. And although the defendant highlights that the instant offense is non-violent, see Def. Mem. at 1, the Guidelines are already designed to account for the nature of the offense.

The other considerations highlighted by the defendant do not outweigh the many factors that counsel in favor of a Guidelines sentence. While the defendant's imprisonment may occasion some hardship for his family, that is neither unique nor dire enough to warrant a variance. All of his children are adults, and there is no indication that any of his other family members specifically rely upon his assistance as a caretaker. See id. at 2–3. It is often an unfortunate consequence that one person's criminal conduct takes its toll on wholly innocent

individuals.[1]  The defendant also has not provided any indication that his health conditions cannot be monitored and treated as needed during his term of incarceration.  See id. at 3–4.  The Court can adequately account for any health issues that the defendant may face by recommending designation to an appropriate Bureau of Prisons facility, rather than imposing a sentence of time served.  See, e.g., United States v. Shams, No. 17-CR-588 (MKB), ECF No. 59 (May 29, 2024) (sentencing 66-year-old defendant with health issues to 60-month term of imprisonment for offenses including conspiracy to pay healthcare kickbacks, and recommending designation to FCI Fort Dix).

IV.     Conclusion

For the foregoing reasons, the government respectfully requests that the Court impose a 60-month Guidelines sentence of imprisonment, as well as order the defendant to pay restitution in the amount of $5,067,936 to CMS and a forfeiture money judgment in the amount of $5,067,936.

Respectfully submitted,

BREON PEACE
United States Attorney
Eastern District of New York

GLENN LEON
Chief
Criminal Division, Fraud Section
U.S. Department of Justice

By:     /s/
Arun Bodapati
Trial Attorney
Criminal Division, Fraud Section
U.S. Department of Justice

cc:     Counsel of Record (via ECF)
United States Probation Officer Meghan Wing

---

[1] Indeed, almost all defendants who come before the Court for sentencing have family members who will be negatively affected by the imposition of a sentence of incarceration. As the Second Circuit has repeatedly emphasized, the Guidelines recognize that "disruption of [a] defendant's life, and the concomitant difficulties for those who depend on the defendant, are inherent in the punishment of incarceration." United States v. Johnson, 964 F.2d 124, 128 (2d Cir. 1992); United States v. Sprei, 145 F.3d 528, 534 (2d Cir. 1998) ("Family ties and responsibilities are a discouraged basis for departure"); United States v. Smith, 331 F.3d 292, 294 (2d Cir. 2003) ("Because the Guidelines disfavor departure based on family responsibilities such a departure is not permitted except in extraordinary circumstances.").